IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| DELOIS DANIELS, | ) | Civil Action No.  3:09-182-JFA-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| JOHN M. MCHUGH, SECRETARY OF THE ARMY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

Plaintiff, Delois Daniels ("Daniels") filed this action in the Court of Common Pleas for Richland County, South Carolina.  Defendant, the Secretary of the Army (the "Secretary"), removed this action to this court on January 23, 2009.   Daniels alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII").[1]  She also alleges a claim for wrongful termination in violation of public policy.  The Secretary filed a motion for summary judgment on March 22, 2010.  Daniels filed a response on April 26, 2010, and the Secretary filed a reply on May 10, 2010.

## FACTS

1.       Daniels, an African-American female, retired from the Army in 1998, as a Lieutenant Colonel at Moncrief Army Community Hospital ("Moncrief" or "MACH") at Fort Jackson, South Carolina.  She worked at Moncrief from 1992 to 1998.  Daniels Dep. 9, 15-16; Daniels' Aff. (Attachment to Plaintiff's Opp. Mem.), Paras. 3, 5.

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g) DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by the court.

2.      After her retirement from the military, Daniels held several jobs in the Columbia area, including work as a nurse consultant with the South Carolina Department of Health and Environmental Control, and as a nurse practitioner with the breast and cervical screening program at Baptist Hospital, at Planned Parenthood of South Carolina, and in private practice with a Columbia physician.  Daniels Dep. 13-14.

3.      On August 8, 2005, Daniels began working in a civilian position at the Troop Medical Clinic ("TMC") at Moncrief Hospital as a Nurse Practitioner, pay grade GS-12.  Complaint, Para. 19; Daniels Dep. 27; Defendant's Ex. 2 (Notification of Personnel Action).

4.      Daniels' appointment was subject to the completion of a one-year initial probationary period. Complaint, Para. 21-22; Defendant's Ex. 2.

5.      Charles Solesbee (Caucasian male), the chief of the TMC, was her immediate supervisor. Daniels Dep. 31; Defendant's Ex. 3 (Report of Investigation) at 1-4.

6.      Colonel (Dr.) Romero Perez (Asian-Pacific Islander male), the Chief of the Gynecology Clinic and a Board certified Obstetrics and Gynecology specialist, was Daniels' second level supervisor.  Daniels Dep. 31; Defendant's Ex. 3 at 4.

7.      On December 1, 2005, almost four months after Daniels returned to Moncrief, Solesbee provided Daniels with her Senior System Evaluation Report Support Form which outlined her duties, responsibilities, objectives, and standards.  Defendant's Ex. 4.

8.      On December 2, 2005, Sergeant First Class Carla Lowe (African-American female), the Non-Commissioned Officer in Charge of the MACH Department of Specialty Care, drafted a memorandum for the record documenting concerns about Daniels' conduct.  Sgt. Lowe stated that Daniels' interactions with co-workers was the significant factor in the employee

turnover in her section.  Sgt. Lowe specifically noted that Daniels refused to hold meetings to address employee concerns, inappropriately allowed soldiers to sleep in the hallway, and sent employees on inappropriate missions.  Defendant's Ex. 5 and 11.

9.     The same day, Sgt. Lowe drafted a second memorandum for the record documenting Daniels' behavior during Lowe's attempt to counsel Staff Sergeant Deborah Ogburn, Non-Commissioned Officer in Charge of the TMC.  Sgt. Lowe said that Daniels continuously interrupted the counseling session and informed Sgt. Lowe, in front of Ogburn, that Sgt. Lowe lacked proper managerial skills and that the counseling should be destroyed. Defendant's Ex. 6.

10.    Sometime prior to March 21, 2006, Sgt. Jaime Morales (Caucasian female) and Sgt. Leandra Steele (Caucasian female), TMC employees, drafted (undated) statements complaining that Daniels had created a hostile work environment.  Defendant's Exs. 7, 8, and 11.

11.    On March 28, 2006, Sgt. Ogburn drafted a memorandum for the record complaining that Daniels was not pleasant to work with, did not respect her, opposed any changes she attempted to make, was argumentative, and wanted things done her way despite the fact that Sgt. Ogburn was the Non-Commissioned Officer-in-Charge.  Defendant's Ex. 9.

12.    On March 21, 2006, Solesbee (Daniels' immediate supervisor) counseled Daniels for belittling other employees and provided her with copies of the statements from Sgt. Morales and Sgt. Steele.  He advised Daniels that she must interact with others in a courteous and professional manner.  Solesbee also counseled Daniels for reporting to work late, and threatening another employee's professional license.  He requested that she work with other employees in a team manner.  Defendant's Exs. 10 and 11 (at 283-285).

13.  In April 2006, Sergeant First Class Tonya Dinkins (African-American female), an Equal Opportunity ("EO") Advisor, reviewed the complaints against Daniels submitted by TMC support staff to determine if an investigation was warranted.  After reviewing the complaints, Sgt. Dinkins consulted with Colonel (Dr.) Jeremiah Stubbs (African-American male) and they determined that this was not an EO matter, in that there was no indication that race or sex was an issue, such that an official EO investigation was not warranted.[2]  See Plaintiff's Ex. 23 (Dinkins Dep.) at 3-6.

14.  On approximately April 20, 2006, Daniels and Dr. Perez had a conversation about a trainee. During the conversation, Dr. Perez told Daniels that there were to be no Papanicolaou ("Pap") tests[3] on trainees for any reason.  Defendant's Ex. 13 (Plaintiff's Rebuttal to Termination) at 25-26; Defendant's Ex. 14 (Fact-Finding Conference Testimony of Dr. Perez) at 128-129.

15.  Daniels states that Perez gave her the first instruction of no pap smears on April 20, 2006, even though she had previously referred soldiers in basic training to him for colposcopies.[4] Daniels Aff., Paras. 22-23.

16.  Daniels testified she telephoned Dr. Perez earlier that week to schedule a colposcopy for another patient and when she telephoned him for the second time to schedule a colposcopy

---

[2] Daniels claims that this investigation was improper and a violation of Army policies because she was not informed of the investigation and because the individual chosen to investigate was military enlisted, but Daniels was a civilian.  Daniels Aff., Paras. 16-21.

[3] A Pap test or smear is "an exfoliative cytological staining procedure for detection and diagnosis of various conditions, particularly malignant and premalignant conditions of the female genital tract (cancer of the vagina, cervic, or endometrium)."  Dorland's Illustrated Medical Dictionary 1878 (30th ed. 2003).

[4] A colposcopy is an examination of the cervix and vagina by means of an instrument with a magnifying lens.  Dorland's at 393.  Defendant provides that this procedure is routinely employed after an abnormal Pap test.

for a trainee, he said, "I told you not to do pap smears, I told you not to do colposcopies" and then hung up on her.  Daniels Dep. 93.

17.    The TMC was reorganized on May 30, 2006, and the gynecological support staff was realigned to the Gynecology Clinic ("GYN Clinic") in the main hospital.  Defendant's Ex. 15.  Daniels was transferred to the GYN Clinic, at which time Lieutenant Colonel Paul Martin (Caucasian male), the Chief Nurse of Ambulatory Medicine, became her immediate supervisor.  Dr. Perez remained her senior rater.  Defendant's Ex. 16 at 7-8; Defendant's Ex. 19.

18.    On June 9, 2006, Dr. Perez and LTC Martin counseled Daniels about their expectations of her at the GYN clinic.  They advised her that all GYN Clinic patients must have an appointment to be seen.  Defendant's Ex. 14 (Perez Dep.) at 164-165; Defendant's Ex. 17 at 323.

19.    Dr. Perez and LTC Martin also counseled Daniels that"[t]here will be no well woman exams for trainees. NO EXCEPTIONS."  They testified that this meant that Daniels should not perform Pap tests on trainees.[5]  LTC Martin, in his fact finding testimony, stated that "if there was something extraordinary that required a pap smear, that was okay, some other condition perhaps that merited [it]."  Defendant's Ex. 14 at 31; Defendant's Ex. 18; Defendant's Ex. 19 at 174-175; Defendant's Ex. 20 at 250-251; Defendant's Ex. 21 at 341, 345.

20.    Dr. Perez stated that he had explained to Daniels on more than one occasion that if a trainee had an abnormal Pap test during her initial entry training, the trainee would be discharged,

_____

[5]Daniels agrees that there were to be no well woman examinations, but argues that Pap tests were allowed for trainees in initial training in certain circumstances.

such that providers should instead do Pap tests after the soldier's initial training. Defendant's Ex. 14 at 76; Defendant's Ex. 17 at 321.

21. Daniels states she performed Pap tests on individuals who were clinically indicated or who were getting out of the military. Daniels' Aff., Para. 28.

22. On June 29, 2006, Daniels performed a Pap test on MBR,[6] a trainee. On July 12, 2006, she performed a Pap test on MAR, another trainee. Defendant's Ex. 14 at 36-37; Defendant's Ex. 22.

23. On July 14, 2006, MBR's Pap test results came back as abnormal. Dr. Perez instructed Vanessa Lobban ("Lobban"), a Licensed Practical Nurse (African-American female) in the GYN Clinic, to inform Daniels that the patient needed to be an EPTS (that is, she had a condition Existing Prior to Service), meaning that Daniels was expected to initiate discharge papers for MBR. Defendant's Ex. 23; Defendant's Ex. 17 at 319-320.

24. Daniels did not initiate discharge papers and told MBR to go to her next duty station and follow up there. Defendant's Ex. 16 at 49-52, 327.

25. On July 14, 2006, Dr. Perez counseled Daniels about her performance of Pap tests. Defendant's Ex. 24.

26. On July 17, 2006, Daniels performed a Pap test on QNE, a trainee. She performed a Pap test on CPH, a trainee, on July 18, 2006. Defendant's Ex. 25 and 26.

27. On July 13, 2006, GYN Clinic Head Nurse Sandra Prewitt (African-American female) and Sergeant First Class Alice Preston (African-America female) complained to Major (Dr.) Dion

---

[6]The names of patients have been redacted and only the initials are being used by the parties to protect the privacy of the individuals involved.

Franga (Caucasian male), the chief of General Surgery, about Daniels accepting walk-in patients and performing after-hours exams.  Defendant's Ex. 27 at 358-360.

28.    Dr. Franga told Daniels that only scheduled, not walk-in, patients, would be seen in the GYN Clinic.  She also informed Daniels that walk-in patients could only be seen if there was an available appointment time or if the clinic's schedule permitted working these patients into the schedule; however, these patients were not to disrupt the flow of scheduled patients. Defendant's Ex. 13 at 37; Defendant's Ex. 27 at 358-362.

29.    On July 20, 2006, Daniels saw four walk-in patients, CB, BRH, AML, and TDT. The Secretary asserts that this caused scheduled patients to not be seen until later than their scheduled times and that walk-ins were seen before some scheduled patients.  Defendant's Ex. 20 at 242-248; Defendant's Ex. 28; Defendant's Ex. 2; Defendant's Ex. 16 at 417-418.

30.    On July 25, 2006, Dr. Perez notified Daniels that he was terminating her employment (during her probationary period) effective August 4, 2006, for failing to follow supervisory instructions and/or clinic policies.  Defendant's Ex. 30.

31.    Daniels was terminated effective August 4, 2006.  Defendant's Ex. 32.

32.    Daniels appealed her termination to the Merit Systems Protection Board ("MSPB").  Her complaint was dated August 11, 2006.  She alleged she was terminated because the Agency "used political deference in the work environment as a means of discrimination for its decision to terminate employment."  She further alleged that this "demonstrated that only those personnel of its political affiliation and mindset would be eligible for retention by its consistent harassment and daily insults in the work environment."  Defendant's Ex. 33.

33.    On September 14, 2006, an MSPB administrative judge dismissed Daniels' appeal for lack of jurisdiction, concluding that Daniels failed to demonstrate that she was terminated due to an affiliation with a recognized political organization.  Defendant' Ex. 34.[7]

34.    On October 20, 2006, Daniels filed an EEO complaint alleging she was terminated on the basis of her race and gender.  Defendant's Ex. 35.

35.    From January to March 2007, the Department of Defense Investigations and Resolutions Division investigated Daniels' claims.  A fact-finding conference was held at which Daniels and twelve agency witnesses testified.  The investigator concluded that management had articulated a legitimate, credible reason for Daniels' termination during her probationary period.  Defendant's Ex. 3.

36.    Daniels requested a hearing before an EEOC administrative judge, but the judge dismissed her administrative complaint after Daniels failed to file a proper prehearing report. Defendant's Ex. 36.

37.    A Final Agency Decision, concluding that Daniels was not the victim of intentional discrimination, was issued on March 17, 2008.  Defendant's Ex. 37.

38.    Daniels appealed the Final Agency Decision to the Equal Employment Opportunity Commission ("EEOC").  The EEOC determined that the agency articulated legitimate, nondiscriminatory reasons for its actions, and that Daniels did not prove that those reasons were a pretext for discrimination.  Defendant's Exs. 38 and 39.

---

[7]An employee in the competitive service who is terminated during her probationary period for post-appointment reasons may appeal to the MSPB for the limited grounds that her termination was the result of discrimination based upon partisan political reasons or marital status.  5 C.F.R. § 315.806(b).

39.    Daniels is currently employed in the OB-GYN Clinic at Madigan Army Medical Center in

Fort Lewis, Washington.  Daniels Dep. at 15.

### STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences

to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.

Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  A fact is deemed "material" if proof of its

existence or non-existence would affect disposition of the case under applicable law.  Anderson, 477

U.S. 242 at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative

assertions will not suffice."  Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.

1985).

The defendant "bears the initial burden of pointing to the absence of a genuine issue of

material fact."  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If defendant carries this burden, "the burden then

shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."

Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

"[O]nce the moving party has met his burden, the nonmoving party must come forward with

some evidence beyond the mere allegations contained in the pleadings to show there is a genuine

issue for trial."  Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).  The party

asserting that a fact cannot be or is genuinely disputed must support the assertion by: (1) citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c) (1)(A-B).

Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e)(1-4).

## DISCUSSION

Daniels appears to allege that she was discriminated against based on her race and sex in violation of Title VII, was subjected to a hostile work environment in violation of Title VII, was retaliated against in violation of Title VII, and was terminated in violation of public policy.  The Secretary contends that he is entitled to summary judgment because: (1) Daniels failed to exhaust her administrative remedies as to her claim for disparate pay or for retaliation;[8] (2) Daniels' claim for violation of public policy is preempted by Title VII and the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 701, et seq.; (3) Daniels fails to carry her burden of persuasion on her race or gender claims;

---

[8]Alternatively, the Secretary contends that Plaintiff's retaliation claim should be dismissed for failure to establish a prima facie case.

and (4) Daniels cannot establish that she was subjected to a hostile work environment.  In her response in opposition to summary judgment, Daniels states that she has not asserted a claim for disparate pay and consents to dismissal of her retaliation claim "due to the EEO failure to investigate" such that she did not exhaust her available administrative remedies as to her retaliation claim.  Plaintiff's Opp. Mem. (Doc. 39) at 14-15.  She argues that the Secretary is not entitled to summary judgment on her remaining claims, as discussed below.

     A.    <u>Disparate Treatment</u>

     Daniels appears to allege that she was subjected to disparate treatment based on her race and/or gender.  The Secretary contends that Daniels is unable to state a prima facie case of race or gender discrimination and that the articulated legitimate, nondiscriminatory reasons for her termination are not a pretext for unlawful discrimination.

     Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may proceed under ordinary principles of proof using direct or indirect evidence, or, in the absence of direct proof of a defendant's intent to discriminate, a plaintiff can employ the scheme outlined in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973) to establish a prima facie case of discrimination by offering proof that:

      (1)    he is a member of a protected class;

      (2)    he was performing his job in a satisfactory manner;

      (3)    he was subjected to an adverse employment action; and

(4)     similarly-situated employees outside the protected class received more favorable treatment.

See White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007); McDonnell Douglas, 411 U.S. at 802.  McDonnell Douglas provides that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas, 411 U.S. at 802.  If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination.  Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

(1)     Prima Facie Case

The parties do not appear to dispute that Daniels meets two of the prongs of her prima facie case, that she is a member of the protected group and was subjected to an adverse employment action.  The Secretary, however, contends that Daniels was not performing her job satisfactorily and that she has not shown that similarly-situated employees received more favorable treatment.

(a)     Job Performance

The Secretary contends that Daniels was not performing her job in a satisfactory manner at the time of her termination because: (1) members of the TMC support staff complained that Daniels created a hostile and unpleasant working environment; (2) Daniels repeatedly disregarded supervisory instructions concerning performing Pap tests on trainees; (3) Daniels accepted walk-in patients in violation of clinic policy causing schedule disruptions; and (4) Daniels failed to initiate discharge papers for a trainee as instructed by her supervisor.

Daniels fails to show that she was performing her job in a satisfactory manner as discussed below.  Although Daniels argues that her job performance was satisfactory, it is the employer's perception of job performance, and not the employee's perception that is controlling.  See Dejarnette v. Corning, Inc., 133 F.3d 293 (4th Cir. 1998); Smith v. Flax, 618 F.2d 1062 (4th Cir. 1980); Shore v. A. W. Hargrove Ins. Agency, Inc., 873 F. Supp. 992, 998 (E.D. Va. 1995); Simmons v. Marsh, 690 F. Supp. 1489, 1493 (E.D.Va. 1988), aff'd, 852 F.2d 566 (4th Cir.), cert. denied, 488 U.S. 996 (1988).

(i)     Daniels' Treatment of Support Staff Personnel

The Secretary argues that Daniels' job performance was not satisfactory based on her derogatory treatment of personnel in the TMC.  In support of this, the Secretary provides two statements written by Sgt. Lowe stating that Daniels was a significant factor in the high personnel turnover rate in the GYN hallway; Sgt. Morales' statement that Daniels made her dread coming to work; Sgt. Steele's statement that Daniels created a hostile and unpleasant working environment, and Ogburn's statement that working with Daniels was unpleasant because Daniels was rude and voiced disagreement with policies in front of patients.  Daniels appears to argue that the statements were not affidavits and that the testimony of these individuals was contradictory.  Her arguments, however, appear to go to the motivation of these staff personnel and if the person was asked to write a statement.  There is no genuine issue of material fact, however, that a number of staff personnel complained about Daniels such that Daniels' supervisors could have reasonably believed that Daniels treated staff personnel in a derogatory manner.

Daniels argues that the Army conducted an improper investigation into whether she created a hostile environment because she was not informed of the investigation and Sgt. Dinkins (an Army

employee) did the investigation, rather than a civilian EEO employee.  The Secretary argues that the inquiry was as to whether military personnel had been harassed such that their complaints were properly considered through the military EO process rather than the civilian EEO process. Nevertheless, even if the inquiry was improper, the inquiry was terminated and Daniels did not receive any adverse action as a result of any inquiry or investigation.

(ii)     Failure to Follow Supervisory Instructions - Pap Tests

The Secretary argues that Daniels was not performing her job satisfactorily because she disregarded her supervisors' instructions to not give Pap tests to trainees in initial training.  In support of this, the Secretary argues that Daniels acknowledges that by April 20, 2006, Dr. Perez informed her that she was not supposed to perform Pap tests on trainees.  See Plaintiff's Aff. Para 22; Defendant's Ex. 13 at 25-26.  Daniels was told not to perform Pap tests on initial trainees again on June 9, 2006.  On June 29 and July 12, Daniels performed Pap tests on two initial trainees.  One of these came back abnormal and Dr. Perez instructed Daniels to initiate discharge papers for the trainee.  On July 14, 2006, Dr. Perez again counseled Daniels for performing Pap tests on trainees.  Daniels, however, performed Pap tests on two more initial trainees.

Daniels appears to argue that the regulations used by Dr. Perez and others were outdated or were contradicted by non-Army policies.  Daniels argues that she knew her job description as she was the one who drafted it while serving in the military at MACH from 1992 to 1998.  The initial position description submitted by Daniels, however, provides:

> The basic clinical guidelines established for a specialty area will be reviewed and/or modified by the supervising physician for each nurse assigned within that specialty. The reviewed and/or modified clinical guidelines/protocols will serve as the standing orders under which the nurse must function.  It is the responsibility of the physician to periodically update clinical guidelines in accordance with changes in the nurse clinician's competency and changes in medical practice.

14

Plaintiff's Ex 14 at 7.  Here, Dr. Perez was Daniels' supervising physician such that his directives regarding Pap tests (that she was not to perform Pap tests on initial trainees) were those under which she was required to function.

Daniels also argues that other clinical personnel were performing Pap tests on trainees and were not disciplined.  In support of this, Daniels submitted a Pap test log (Plaintiff's Ex. 41) which she claims supports her assertions. As noted by the Secretary, however, this log is largely illegible such that it is impossible to tell whether the Pap tests were done on initial trainees and who performed them.  Further, Daniels asserts that this log is a record of Pap tests from August 2005 to February 2006 (Plaintiff's Opp. Mem. at 7) - which is before the June and July 2006 Pap tests in question.  Additionally, the mere fact that Pap tests were performed by Daniels and others is not the issue.  The parties do not appear to dispute that performing Pap tests on non-initial trainees (most of the patients seen at MACH were in training, just not initial training) and Pap tests on soldiers slated for discharge was appropriate.

Daniels also points to testimony from LPN Sheryl Smith (see Plaintiff's Ex. 34) in which Smith stated that other providers did Pap tests on initial trainees.  The providers in question, however, have not been identified and the times they allegedly did these Pap tests is not given.  Thus, Daniels has not identified any other nurse practitioner who did  Pap tests on initial trainees after April 2006.

(iii)     Walk-In Patients

The Secretary asserts that Daniels was not performing her job in a satisfactory manner because she disregarded supervisory instructions by accepting walk-in patients, violating clinic policy and causing schedule disruptions.  Daniels argues that Dr. Franga

gave her permission to see walk-ins, the walk-in patients were seen to provide them test results, walk-ins were at Daniels' discretion, and many of the disruptions were due to the fact that the clinic only had one receptionist and two persons to take weight and blood pressures for four providers.

Dr. Perez instructed Daniels on June 9, 2006 that patients at the GYN clinic needed an appointment to be seen. <u>See</u> Defendant's Ex. 14 at 164-165; Defendant's Ex. 17 323. Prewitt testified that patients were not seen at their scheduled times on July 20, 2006 because of walk-ins. Defendant's Ex. 20 at 242-248. Dr. Franga testified that both GYN Clinic Head Nurse Prewitt (African-American Female) and NCOIC Preston (African-American Female) complained about Daniels' acceptance of walk-in patients   Ex. 27 at 358-360.

(iv)     <u>Failure to Discharge</u>

The Secretary asserts that Daniels was not performing her job in a satisfactory manner because she disregarded Dr. Perez's instruction to initiate the discharge of trainee MBR after MBR's Pap test result came back abnormal. Daniels argues that she did not disregard this instruction because Dr. Perez never told her to do this. In her prior testimony, however, Daniels stated that Dr. Perez stopped by her office to inform her to discharge the trainee in question. Defendant's Ex. 16 at 48.

(b)     <u>Less Favorable Treatment</u>

Daniels appears to assert that she was treated less favorably than similarly-situated employees because Lieutenant Colonel Gertdell Phyall testified that another employee received more counseling than Daniels received before she was terminated. She also

16

claims that other providers who did Pap tests on trainees were not terminated. The Secretary contends that Daniels fails to show that she received less favorable treatment than a similarly-situated employee outside her protected class(es) because she has not identified any other nurse practitioner who was similarly situated.

In making a comparison of a plaintiff's treatment to that of employees outside the protected group, a plaintiff must show that the comparables are similarly situated in all relevant respects. See Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992); see also Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir. 1988)(plaintiff must prove that he and non-protected employee were similarly situated in all respects and the other employee's acts were of comparable seriousness to his own); see also Heyward v. Monroe, 166 F.3d 332, 1998 WL 841494 (4th Cir. Dec. 7, 1998)(unpublished)(employees similarly situated only if they "dealt with the same supervisor, [were] subject to the same standards and...engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (citations omitted)), cert. denied, 527 U.S. 1036 (1999); Smith v. Stratus Computer, Inc., 40 F.3d 11 (1st Cir. 1994)(in disparate treatment cases, employees must be similar in "all relevant aspects" including performance, qualifications, and conduct)(citation omitted), cert. denied, 514 U.S. 1108 (1995); see also Bogren v. Minnesota, 236 F.3d 399, 405 (8th Cir. 2000)(finding that probationary and non-probationary employees are not similarly situated), cert. denied, 534 U.S. 816 (2001).

Daniels fails to show that she was treated less favorably than a similarly-situated individual outside her protected class. None of her comparators were male. She also fails to show that there

17

was a similarly-situated (worked for the same supervisor, was a probationary employee) nurse practitioner[9] outside her protected race category who was treated more favorably.

Daniels claims that she was treated differently than a nurse who was terminated during her probation period because the nurse, who was supervised by LTC Phyall, received two to three counselings and was given two months to correct her identified deficiencies, while Daniels was not given as many counselings and was terminated shortly after her July counseling.   Even if Daniels is able to show that this person was outside her protected class (Phyall referred to the employee as "she" and said that the employee was black) and was treated less favorably, she fails to show that she and the other unnamed employee are similarly situated because the other employee was a nurse (not a nurse practitioner) and because they were supervised by different persons.[10]   See Phyall Dep. (Plaintiff's Ex. 22) at 24 and 29.[11]

> (2)     Legitimate, Nondiscriminatory Reason/Pretext

---

[9]The Secretary provides that one possible comparator (Perkins -Caucasian) did not work for Perez and that another possible comparator (Scheryl-Caucasian) did not work at MACH at the same time as Daniels.

[10]Daniels appears to attempt to show that she and the nurse were supervised by someone in the same chain of command by stating that LTC Phyall was LTC Martin's supervisor.  Phyall testified, however, that she was not in LTC Martin's supervisory chain and that she and LTC Martin were basically on equal settings in the supervisory chain.  Phyall Dep. at 6.

[11]To the extent that Daniels is attempting to assert a disparate discipline claim, she fails to establish her prima facie case.  To establish a prima facie case of disparate discipline, a plaintiff must show "(1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person."  Lightner v. City of Wilmington, N.C., 545 F.3d 260 (4th Cir. 2008), citing Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985)(adapting the McDonnell Douglas framework for the employee discipline context).  Plaintiff has not shown that she received disciplinary measures that were more severe than those enforced against a similarly-situated person.

18

The Secretary has articulated  legitimate, nondiscriminatory reasons for its actions, that Daniels was terminated during her probationary period for failure to follow supervisory instructions and/or clinic policies.  See Defendant's Exs. 30 (Memorandum to Daniels from Perez- Termination During Probationary Period) and 32 (Notification of Personnel Action - Termination).  Daniels appears to argue that these reasons are pretext for discrimination because Defendant failed to follow the proper procedures for disciplining a probationary employee including giving her a letter telling her to improve.  She also argues that the reason given for her termination was the direct disobeying of a supervisor, but the supervisor in question permitted others employees to provide the medically indicated care and terminated only Daniels for such actions.  Finally, Daniels argues that the medical records the Army relies on to show that she did not follow policy regarding walk-ins are not correct because delays in when a patient was seen may have been due to delays by the receptionist or the persons taking weight and blood pressure measurements.

Daniels fails to show that the legitimate, nondiscriminatory reasons for her termination are false or pretext for impermissible discrimination.  She appears to assert that she was justified in performing Pap tests on trainees because she felt the tests were medically necessary.  Dr. Perez, however, testified that problems for which these trainees were seen, such as sexually transmitted diseases, were diagnosed through cultures and/or blood tests, not Pap tests.  See Defendant's Ex. 14 at 76-79.  Colonel Phyall testified that if there was a conflict between the state board of nursing and Army Regulations, the Army regulations were to be followed.  Plaintiff's Ex. 22 at 22. Even if Daniels could show that the delays in seeing patients were due to shortages of personnel performing other functions, she still fails to dispute that she saw walk-in patients after being told not to do so by Dr. Perez.  Although Daniels claims that she did not treat staff members in a derogatory manner, the

19

Pap tests were necessary, she should have been allowed to accept walk-in patients, and she should not have initiated discharge paperwork on a trainee with a positive Pap test, she fails to show that the Secretary's articulated reasons for her termination were false or were not the real reasons for the action.  See, e.g., Hawkins v. PepsiCo, Inc., 203 F.3d 274 (4th Cir. 2000); Kun v. Berkeley County Gov't, 214 F. Supp.2d 559, 566 (D.S.C. 2001), aff'd, 32 Fed. Appx. 689, 2002 WL 570670 (4th Cir. Apr. 17, 2002).  Federal Courts "do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005), citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir.1998); see also Rowe v. Marley Co., 233 F.3d 825, 831 (4th Cir. 2000)("The decision to discharge [plaintiff] and retain [other employees] is the kind of business decision that we are reluctant to second-guess."); see also Swanson v. General Servs. Admin., 110 F.3d 1180, 1186 (5th Cir. 1997)(holding that "[t]he pretext question is not a question whether [the plaintiff] 'considered himself' late, but whether [the employer] considered [the plaintiff] late when he decide to charge [the plaintiff] with annual leave for his tardiness").

Daniels argues that Defendant did not have a legitimate, nondiscriminatory reason for her termination because Defendant failed to follow the proper procedures including providing her with a letter telling her she needed to improve her job performance.  Plaintiff's Opp. Brief at 24.  The regulation cited by Daniels, as to probationary or trial periods, however, merely provides:

> Raters **normally** should provide Ratees who are not meeting exceptions with enough information to understand how they are failing and how they might improve.

Plaintiff's Ex. 9, Total Army Performance Evaluation System, Section 2-6 Probationary or Trial Periods (emphasis added).  Further, Daniels was given notice and opportunity to improve as discussed above.

20

B.     <u>Hostile Work Environment</u>

Daniels alleges that "Defendant's actions of discriminating against the Plaintiff created a hostile work environment for the Plaintiff." Complaint, Para. 105. The Secretary contends that Daniels fails to establish a hostile work environment claim because she fails to show that the alleged incidents were related to her race or gender and she fails to show that the alleged conduct was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive atmosphere. In her opposition memorandum, Daniels argues that Dr. Perez created a hostile environment because he constantly attempted to get rid of her and he initiated an improper EO inquiry.

To prevail on a Title VII hostile environment claim based on sex or race, a plaintiff is required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the [sex or race] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." <u>Spicer v. Virginia Dep't of Corrs.</u>, 66 F.3d 705, 710 (4th Cir.1995) (en banc); <u>see also</u> <u>Mosby-Grant v. City of Hagerstown</u>, __ F.3d __, 2010 WL 5151617 (4th Cir. 2010); <u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

Daniels fails to establish a hostile environment claim because she fails to show that the alleged harassment was based on her sex and/or race. She also fails to show that the alleged harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment.

Daniels argues that the Army's EO investigation of her conduct created a hostile environment. She, however, states in her affidavit that she did not even become aware of this investigation until she read about it in her termination package. Daniels' Aff., Para. 20. See Nicole v. Grafton School, Inc., 181 F.Supp.2d. 475, 482 ((D.Md. 2002)("Events which occurred without the knowledge of Plaintiff could not have contributed to her perception that the workplace was hostile.")(internal citations omitted). Even if Daniels could show that Dr. Perez did not communicate directly with her concerning the discharge of the trainee with the positive Pap test, she fails to show that this established a hostile environment claim. See Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772-73 (4th Cir. 1997)(the alleged events must establish "'that the harassment was sufficiently severe or pervasive to create an abusive working environment.'...Hartsell's allegations demonstrate only that the salespeople were unpleasant and sometimes cruel.").

C.     Discharge in Violation of Public Policy

Daniels alleges that she was terminated in violation of public policy because she reported negligent behavior regarding the medical care of recruits and female enlisted personnel; contacted the Department of Health and Human Services concerning birth control regulations; and requested that the Acting Deputy Commander for Clinical Services and her rater contact TRADOC for current policies concerning contraception, the performance of Pap tests, and the management of abnormal Pap tests during basic training. The Secretary argues that Daniels' claim for violation of public policy is preempted by Title VII and the CSRA. Daniels contends that her claim is not barred by Title VII because it is related to her reports of negligent behavior.

It is recommended that Defendant's motion for summary judgment be granted as to this claim. In her complaint, Daniels has not asserted any basis for jurisdiction over this claim. Further, Title VII

22

is the exclusive, preemptive remedy for claims arising out of discrimination in federal employment.

Brown v. General Servs. Admin., 425 U.S. 820 (1976); Pueschel v. U.S., 369 F.3d 345, 353 (4th Cir.

2004).   Even if Daniels is complaining of personnel practices unrelated to her claims of

discrimination, they are not subject to judicial review because the CSRA is the exclusive remedy for

federal employees seeking redress of non-discriminatory personnel actions connected with federal

employment. See United States v. Fausto, 484 U.S. 439 (1988). This includes all non-discriminatory

personnel practices which result in Constitutional violations.   Johnson v. Runyon, 91 F.3d 131, 1996

WL 405218, *2 (4th Cir. July 19, 1996)[Table]("[W]e have held that CSRA remedies are

constitutionally adequate and therefore, create an insurmountable barrier to a *Bivens* suit in district

court.")(citing Pinar v. Dole, 747 F.2d 899 (4th Cir.1984)).[12]

---

[12]To the extent that Daniels is attempting to assert  claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671 et seq., such claims should be dismissed because a suit under the FTCA lies only against the United States, and a federal district court lacks subject-matter jurisdiction over claims asserted against federal agencies or individual federal employees. See Myers & Myers, Inc. v. United States Postal Serv., 527 F.2d 1252, 1256 (2d Cir. 1975).  Additionally, an administrative claim must first be filed with the appropriate federal agency before commencement of a civil action in a district court under the FTCA.  See O'Rourke v. Eastern Air Lines, Inc., 730 F.2d 842, 855 (2d Cir. 1984), superannuated, in part, on unrelated grounds, Salve Regina College v. Russell, 499 U.S. 225 (1991).  Daniels has not alleged a claim against the United States and has not asserted that she filed an administrative claim under the FTCA. Further, "[a] plaintiff may not avoid the CSRA by cloaking his lawsuit in the guise of an FTCA action." Nguyen v. United States Department of Defense, 39 F.3d 1178 (4th Cir.1994)[Table](citing Rollins v. Marsh, 937 F.2d 134, 139 (5th Cir.1991)).

## <u>CONCLUSION</u>

Based on the foregoing, it is recommended that Defendant's motion for summary judgment

(Doc. 34) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

January 18, 2011
Columbia, South Carolina